# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

CAROLINA CASUALTY INSURANCE
COMPANY,

        **Plaintiff,**

    v.

CANAL INSURANCE COMPANY, OHIO, et al.,

        **Defendants.**

Case No. 2:11-cv-736
**JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Terence P. Kemp**

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. No. 30) and Plaintiff's Motion for Summary Judgment (Doc. No. 32). For the reasons that follow, the Court **GRANTS** Defendant's Motion and **DENIES** Plaintiff's Motion.

### I.

On December 16, 2007, Jama Farah was driving a semi tractor-trailer on Interstate 78 in New Jersey. It was snowing and Farah's truck jackknifed, leaving it disabled across multiple lanes on the highway. Following that initial accident, a bus carrying passengers collided with the jackknifed tractor-trailer and several passengers were injured. Two personal injury lawsuits arising out of the accident were filed in New York. The actions named as defendants a travel company, Forward Air, Inc. Forward Air Corporation, Jama Farah and Give Me The Freight, LLC d/b/a GTF ("GTF"). GTF added Green Line Trucking, Inc. ("Green Line") as a third party defendant in each of the cases.

At the time of the accident, Farah was transporting mail from Alabama to New Jersey. GTF hired Farah to haul the mail. Farah was driving a 2001 Freightliner semi tractor-trailer,

Vehicle Identification Number of IFUJAHCG31LF98685.  Farah owns a half interest in the

tractor-trailer and Yussef Mohamed owns the other half.   Mohamed is also the owner of Green

Line, a Columbus, Ohio business.

At the time GTF hired Farah for the mail run, Farah asked GTF if it could provide

insurance coverage to him.  GTF suggested that he contact Green Line, who had a policy with

Defendant Canal Insurance Company ("Canal"), and inquire whether it could provide the

insurance.  Farah contacted Green Line and asked if he could be added to its commercial trucking

insurance policy.  Green Line submitted an application to Canal requesting to add Farah's and

Mohamed's tractor-trailer to Green Line's policy with Canal, Insurance Policy No. PIA02578101

("Green Line Policy").  (Green Line Policy; Docs. No. 32-5, 32-6.)  Green Line is the named

insured on the Green Line Policy and Mohamed is the only listed covered driver on the Policy.

Farah paid a premium of between $800 and $1,000 to Green Line for the coverage.  Canal added

the vehicle as a "covered auto" under Green Line's policy, and provided an insurance card to

Farah.

After the accident, Farah sought coverage under the Green Line Policy.  On August 14,

2009, March 4, 2010, July 8, 2010, and December 13, 2010, GTF's counsel sent correspondence

to Canal indicating that it was GTF's position that the accident should be covered under the

Green Line Policy and that Canal was responsible to defend and indemnify Farah and Green Line

in the New York lawsuits.  (GTF Correspondence; Doc. No. 32-7 at 3–4, 13–14, 17, 24–25.)

On April 26, 2010, and December 28, 2010, Canal responded to GTF, denying coverage

based on its position that Farah was not insured at the time of the accident because he was not a

permissive user under the Green Line Policy while employed by GTF.  Specifically, Canal

2

asserted that its insured, Green Line, was not a party to the personal injury actions in New York, that Farah was not working for Green Line at the time of the accident, that Green Line did not provide permission for Farah to operate the vehicle during his employment with GTF, that neither Farah nor GTF were listed as additional insured under the Canal Policy, that neither were insured at the time of the accident because they did not meet the Policy's definition of "an Insured" in either Section II(A)(1)(a) or Section II(A)(1)(b) of the Green Line Policy, and that even if they were "insured" they were excepted from coverage under subsection (1) of the exceptions found in Section II(A). (Canal Denial Letters; Doc. No. 32-7 at 15, 28–29.)

At the time of Farah's accident, GTF was insured by Plaintiff Carolina Casualty Insurance Company ("Carolina"). Carolina has undertaken the defense of Farah and GTF in the New York actions pursuant to an MCS-90 Endorsement on the insurance policy issued by Carolina to GTF ("GTF Policy").

On August 12, 2011, Carolina brought this declaratory judgment action, pursuant to its subrogation and assignment rights, against Canal. Carolina requests a declaration that the Green Line Policy provides coverage for Farah and GTF in the New York actions; that the Green Line Policy requires Canal to defend and indemnify Farah and GTF; that the Green Line Policy provides primary coverage over Farah's tractor-trailer; that Carolina is released from any further obligation to defend or indemnify Farah under the GTF Policy; and that Canal must reimburse Carolina for all defense expenses, including legal fees, and any indemnity payments from the date the claim was first tendered to Canal.

On January 3, 2013, both Canal and Carolina moved for summary judgment on all Carolina's claims. (Docs. No. 30, 32.) Those motions are ripe for review. (Docs. No. 34, 35,

36, 37.)

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts."). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby*, 477 U.S. at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

## III.

The parties agree that Ohio law applies to the interpretation of the Canal Policy. In interpreting an insurance contract under Ohio law, a court must give effect to the intent of the parties to the agreement. *Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co.*, 691 F.3d 821, 826 (6th Cir. 2012) (citing *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St. 3d 270, 273 (1999)). "Ohio courts shall give insurance contract terms their plain and ordinary meaning unless another meaning is clearly apparent from the contents of the policy." *Id.* (citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St. 2d 241 (1978) (syllabus ¶ 2)). Further, a court must give

4

meaning to every paragraph, clause, phrase and word. *Affiliated FM Ins. Co. v. Owens-Corning Fiberglas Corp.*, 16 F.3d 684, 686 (6th Cir. 1994) (citing *Heifner v. Swaney*, 1992 Ohio App. LEXIS 4177, 1992 WL 198120, at *2 (Ohio App. 3rd Dist. Aug. 27, 1992)). When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. *Id.* As a matter of law, a contract is unambiguous if it can be given a definite legal meaning. *Retail Ventures*, 691 F.3d at 826 (citing *Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d 216, 219 (2003)).

A term is ambiguous if it is reasonably susceptible of more than one meaning. *St. Mary's Foundry, Inc. v. Employers Ins. of Wausau*, 332 F.3d 989, 992 (6th Cir. 2003) (citations omitted). Where the written contract is standardized and between parties of unequal bargaining power, an ambiguity in the writing will be interpreted strictly against the drafter and in favor of the nondrafting party. *Cent. Realty Co. v. Clutter*, 62 Ohio St. 2d 411, 413 (1980). In the insurance context, as the insurer customarily drafts the contract, an ambiguity in an insurance contract is ordinarily interpreted against the insurer and in favor of the insured. *King v. Nationwide Ins. Co.*, 35 Ohio St. 3d 208 (1988) (syllabus). "Nonetheless, this rule 'will not be applied so as to provide an unreasonable interpretation of the words of the policy.'" *Retail Ventures*, 691 F.3d at 826 (quoting *Morfoot v. Stake*, 174 Ohio St. 506 (1963) (syllabus ¶ 1)).

In the case *sub judice*, the parties agree that Green Line requested insurance coverage from Canal for Farah's truck before Farah's accident, that Farah paid a premium to Canal for his tractor-trailer to be added as a covered auto to the Green Line Policy, that Canal listed Farah's truck as a covered auto on the Policy and that Farah did not request nor was he added to the Policy as an additional insured driver. Farah believed that the Green Line Policy would provide

5

coverage of his truck during the Alabama to New Jersey mail run.

There is also no dispute that "Farah was driving the vehicle with the express permission[1] of Yussef Mohammed, the owner of Green Line." (Carolina Mot. for Summ. J. at 2.) And that "Green Line's permission was provided with the knowledge that Farah was hauling freight for [GTF].[2] *Id.* (citing Farah Dep. at 47–48; Docs. No. 28, 28.) Farah kept a logbook for the mail transport, a copy of which was provided to GTF, and Farah was paid by GTF for the job.

What the parties do disagree about is whether the Green Line Policy provides coverage of a scheduled vehicle, driven by its owner/operator who is not a listed driver, while the driver is working for a company other than the named insured. Carolina argues that the Green Line Policy does provide such coverage. Contrarily, Canal maintains that Farah and Mohamed (co-owner of the tractor-trailer and owner of Green Line), attempted a "shady deal to allow Farah to purchase an insurance certificate so he could operate for GTF." (Mot. for Summ. J. at 14.)

---

[1]In one of its denial letters, Canal indicated that one of the reasons it was denying coverage was because Green Line did not provide permission to Farah to operate the tractor-trailer during his employment with GTF. Canal has since changed its position on this issue and relies instead on the other reasons it articulated for denying Farah's claim.

[2]The Court notes that, in its argument that the Trucker's Endorsement does not apply in this case to except the accident from coverage under the Green Line Policy, Carolina asserts that Green Line was supposed to receive a hauling fee from Farah for his work with GTF. (Carolina Mem. in Opp. at 12–14); *see also* (Canal Reply at 2–3; Doc. No. 36) (asserting that Carolina is confused about the testimony, citing additional testimony that reflects the agreement was about a fee arrangement that would apply if Green Line brokered a load to Farah in the future). While Carolina's contention made in relation to the Trucker's Endorsement may at first blush appear to be inconsistent with Carolina's statement that Farah was hauling freight for GTF (as opposed to working for Green Line), the Court recognizes that it is not. In one instance, Carolina seeks to support its position that the type of arrangement GTF made with Farah was not the "type of contract for hire contemplated by the Trucker's Endorsement in the Green Line policy." (Carolina Mem. in Opp. at 14.) In the other instance, *supra*, Carolina simply states the fact that GTF hired Farah for the mail run.

6

Thus, the issues before the Court are whether (A) Farah and/or GTF were insured under the Green Line Policy at the time of the accident, and/or (B) whether Farah and/or GTF are covered under the MCS-90 Endorsement to the Green Line Policy.

## A. Insured

Canal argues that neither Farah nor GTF were insured under the Green Line Policy at the time Farah was working for GTF and that even if they were considered insured, there are specific exclusions that apply to except them from coverage. As to the first proposition, Canal asserts that the Green Line Policy unambiguously defines who is an "insured" and that neither Farah nor GTF [3] qualify. Canal's argument is well taken.

The Green Line Policy provides:

1. Who Is An Insured

The following are "insureds":

     a.  You for any covered "auto".

     b.  Anyone else while using with your permission a covered "auto" you own, hire or borrow except: . . .

(Green Line Policy § II(A)(1)(a) and (b); Doc. No. 32-5 at 34–35.)

Recognizing that "you" in subsection (a) refers to Green Line, the holder of the Green Line Policy, both parties focus on subsection (b), the permissive user provision. Canal contends

---

[3]Carolina argues that the Green Line Policy provides coverage for GTF under the theory of *respondeat superior*. (Carolina Mot. for Summ. J. at 7) ("Anyone liable for the conduct of an 'insured' driver, such as Jama Farah will be deemed an insured under Canal's policy, and entitled to a defense and indemnification thereunder."). Because the Court determines that Farah was not an "insured" under the Green Line Policy at the time of the accident at issue in this case, the Court need not reach this argument, and will throughout this decision refer only to coverage as it relates to Farah.

that Farah does not qualify as a permissive user insured. The permissive user provision provides coverage to anyone, while using with Green Line's permission, using a covered auto that Green Line owns, hires or borrows, with some exceptions.

There is no dispute that the tractor-trailer Farah was driving was a covered auto. There is also no dispute that Farah was driving it with Green Line's permission. Canal argues, however, that Green Line neither owns the tractor-trailer nor was it hired or borrowed by Green Line at the time of the accident. Therefore, Canal concludes that Farah was not covered as a permissive user under the Green Line Policy at the time of the accident.

In response, Carolina does not contend that Green Line hired or borrowed Farah's covered vehicle. Instead, Carolina first argues that because "Canal expressly accepted the risk of insuring the liability resulting from the operation of the involved vehicle, accepted and retained significant premiums for such coverage, it cannot now be heard to deny coverage for this claim under the guise of nonownership." (Carolina Reply at 3; Doc. No. 37.) Carolina maintains that "nowhere in the policy is coverage conditioned solely upon ownership of a covered vehicle." *Id.* Carolina's argument inaccurately frames the issue.

While it is true that the Green Line Policy does not condition coverage *solely* upon ownership of a covered vehicle, the Policy does condition coverage upon meeting the definition of an insured. That definition unambiguously indicates that to be insured as a permissive user, the individual must be driving a covered auto that Green Line owns, hires or borrows.

Second, Carolina contends that even if Green Line is required to own the covered auto, it does so qualify. Specifically, Carolina posits that Green Line did in fact "own" the tractor-trailer Farah was driving at the time of the accident. To support this proposition, Carolina asserts that

8

being the "titled" owner of a covered auto is not the only way in which a vehicle can be "owned"

by Green Line under the Green Line Policy. Carolina points out that Question 10 on Canal's

insurance application asks for a description of vehicles seeking to be added as covered autos and

provides the following possible "owner types":

> N=Owned by Named Insured; L=Owned by Leasing Company (long term lease
> without driver); O=Owned by Owner Operator; E=Owned by employee of Named
> Insured (Officer)

(Carolina Mem. in Opp., Ex. 1; Doc. No. 35-1). Green Line indicated that the owner type for

Farah's truck was "O," owned by the owner operator. Carolina concludes that because the

application recognizes multiple manners in which a vehicle may be "owned," there are multiple

ways in which Green Line may "own" a vehicle under the Policy. Specifically, Carolina states:

"Canal cannot now assert that there is only one way Green Line could have 'owned' the vehicle

— through title issued only to Green Line, and not on a vehicle owned by an operator —when it

recognized multiple 'owner type(s)' (including the 'owner type' asserted in this matter) at the

time it issued a policy and received the benefit of a premium from Green Line." (Carolina Mem.

in Opp. at 5; Doc. No. 35.) The Court, however, is not persuaded.

Just because Canal gathered information on its application as to the ownership status of a

particular vehicle for which coverage was sought, does not somehow translate into the policy

holder actually owning each of the vehicles regardless of whether the vehicle is owned by a

leasing company, owned by an owner operator, or owned by an employee of the named insured.

This portion of the application simply indicates that the Policy may cover a vehicle owned by

someone other than the named insured; such vehicle still must be hired or borrowed by the

insured for coverage to apply. This Court must give the term "own" its plain and ordinary

9

meaning unless another meaning is clearly apparent from the contents of the Green Line Policy. *See Alexander*, 53 Ohio St. 2d at syllabus ¶ 2. Even accepting that the Court is permitted to look outside of the four corners of an unambiguous contract to give meaning to the intent of the parties, Question 10 of the application does not make another meaning of the term "own" clearly apparent.

Carolina's third argument is that if the Court accepts Canal's interpretation of the permissive user provision, it would be unable to give meaning to all provisions in the contract:

> The omnibus clause found at Section II, A(1)(b) provides coverage to "anyone" using with permission a covered auto the insured owns, hires or borrows. *See* Exhibit 3. Canal seems to argue that its policy cannot cover Jama Farah's permissive use of a vehicle it agreed to cover, because the vehicle was not owned, hired or borrowed by Green Line Trucking. If Canal's interpretation of the policy can be accepted at face-value, there would be coverage only for the named insured, regardless of whether the named insured gave permission to use a covered auto, expressly contradicting the terms of the insuring clause.

(Carolina Reply at 4; Doc. No. 37). This Court disagrees with Carolina's conclusion.

The permissive user provision of the Green Line Policy does not provide coverage only for Green Line, regardless of whether Green Line gives permission to use a covered auto. For example, if Green Line had *hired* Farah to transport a load of mail in his tractor-trailer and Farah caused an accident, that accident would have been covered under the permissive user provision. This is because Farah would have been "using with [Green Line's] permission a covered 'auto' [Green Line]" hired. (Green Line Policy § II(A)(1)(a) and (b); Doc. No. 32-5 at 34–35.)

Another example would be if the accident occurred at a time Green Line had given permission to Farah to transport mail in one of the autos covered under the Green Line Policy that Green Line *owned*. That accident would have been covered because Farah would have been

10

"using with [Green Line's] permission a covered 'auto' [Green Line]" owned. *Id.*

In any event, what the language does prohibit is the situation before this Court - that is, coverage of an accident in which Green Line gave permission for someone to drive a covered auto that it did not own, hire or borrow.

Fourth, Carolina addresses a statement made by Canal in its Motion for Summary Judgment related to the purpose of the permissive user provision. Canal stated that "[t]his provision of the Green Line Policy ensures that the company covers only those events in which it has an insurable interest, and provides coverage when Green Line has a business interest in the job being performed." (Canal Mot. for Summ. J. at 11; Doc. No. 30.) Carolina contends that "Canal's argument that the policy cannot provide coverage because Green Line had no insurable interest in the vehicle" is "doomed to failure" because Canal "cannot invoke the Insurable Interest doctrine to avoid coverage of a third party's claim for bodily injuries." (Carolina Mem. in Opp. at 2–3; Doc. No. 35); *see also* Carolina Reply at 5–6; Doc. No. 37.) Carolina's argument, however, misses the mark. Canal nowhere seeks to invoke the insurable interest doctrine. Canal merely provided its reasoning for utilizing particular language in the Green Line Policy. Because the Court finds that provision unambiguous, Canal's explanation of its utilization of particular language is of no moment in this Court's analysis. *See Westfield Ins. Co.*, 100 Ohio St. 3d at 219 (When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties.).

The last argument presented by Carolina related to whether Farah was insured under the permissive user provision is that the doctrines of estoppel or waiver prevent Canal from relying on its argument that Farah's truck was not "owned" by Green Line as the basis for denial of

11

coverage. Carolina maintains that Canal should be limited to reliance on its "original basis for denial of coverage." (Carolina Mem. in Opp. at 15; Doc. No. 35.) Carolina relies on Canal's second correspondence denying coverage, in which it indicated that Green Line "emphatically denied" granting Farah permission to transport the mail load for GTF. (Denial Letter; Doc. No. 32-7 at 28.) Carolina points out that it was only after Farah testified in the underlying lawsuits, establishing that he was driving the tractor-trailer for GTF with the permission of Green Line, that Canal raised its current arguments related to Green Line's lack of ownership of the truck. Carolina concludes that "[s]uch an after-the-fact approach to insurance coverage (deny first, determine rationale for denial second) is impermissible as a matter of law." (Carolina Mem. in Opp. at 16.) Carolina's argument is not well taken.

Initially, the Court notes that Canal's first denial of coverage did not include the claim that Green Line denied that it gave permission to Farah, but instead raised several similar reasons why Canal denied the claim, citing specifically to the permissive user provision. (Denial Letter; Doc. No. 32-7 at 15.) It was not until its second denial letter that Canal indicated that Green Line denied that it gave permission to Farah. *Id.* at 28–29. Moreover, in neither denial letter did Canal rely exclusively on the asserted lack of permission from Green Line, raising several defenses to coverage in both denial letters.

Additionally, even if Canal failed to indicate that its denial was based on Farah's failure to qualify as a permissive user at the time of the accident, the doctrines of estoppel and waiver would not prevent Canal from relying on that argument now. As Canal correctly points out, in Ohio "waiver and estoppel cannot be invoked to create coverage under an insurance policy where coverage otherwise does not exist." *Cincinnati Ins. Co. v. Thomas*, 2006 Ohio 6540, No.

CA2005-12-518, 2006 Ohio App. LEXIS 6449 at *8 (Ohio App. 12th Dist. Dec. 11, 2006)

(citing *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.*, 64 Ohio St.3d 657, 668 (1992)).[4]

Based on the foregoing, the Court concludes that Farah was not an "insured" under the

Green Line Policy at the time of the accident which is the basis of the New York personal injury

lawsuits. Consequently, the Court need not determine whether Canal is correct that the Green

Line Policy also contains exclusions that except coverage for the accident.

**B. MCS-90**

Both the GTF Policy and the Green Line Policy contain identical MCS-90 endorsements.

Understanding the relevance of an MCS-90 endorsement requires some comprehension of the

purpose of the endorsement. The Sixth Circuit has explained:

> It is common practice for motor carriers who operate under the authority of
> the [Interstate Commerce Commission ("ICC")], *i.e.* "authorized carriers" to lease
> equipment from independent contractors who are not regulated by the ICC.
> Historically, this practice led to abuses which threatened the economic stability of the
> trucking industry and public interest. *American Trucking Ass'ns v. United States*, 344
> U.S. 298, 304-05 (1953); *Empire Fire & Marine Ins. Co. v. Guaranty Nat'l Ins. Co.*,
> 868 F.2d 357, 362 (10th Cir. 1989); 4 Saul Sorkin, Goods in Transit, § 45.02[2]
> (1994). Unscrupulous ICC-licensed carriers would use leased vehicles to avoid
> safety regulations governing equipment and drivers. *American Trucking*, 344 U.S.
> at 305. Authorized carriers' use of non-owned vehicles also caused public confusion
> as to who was financially responsible for the vehicles. *Empire Fire*, 868 F.2d at 362;
> *Mellon Nat'l Bank & Trust Co. v. Sophie Lines, Inc.*, 289 F.2d 473, 477 (3d Cir.
> 1961).
>
> To right these wrongs, Congress amended the Interstate Commerce Act to

---

[4]The "exception to this general rule is where an insurer undertakes to defend or settle a
claim against an insured for such a period of time as to prejudice the insured without preserving
its right to assert policy defenses." *Id.* (citation omitted); *see also Socony-Vacuum Oil Co. v.
Continental Cas. Co.*, 144 Ohio St. 382, 392 (Ohio 1945) (waiver or estoppel can serve to
compel an insurer to pay a judgment where the insurer defended without reservations or notice of
claim of reservations). No exception to this principle applies to the facts as they are presented in
this case.

allow the ICC to promulgate regulations governing all aspects of the non-owned equipment by authorized carriers. *See* 49 U.S.C. § 304(e) (1956), revised 49 U.S.C. § 11107 (1978); *see also* 49 U.S.C. § 10927. *See generally Empire Fire*, 868 F.2d at 362; 4 Sorkin, Goods in Transit, § 45.03. ICC regulations now require that every lease entered into by an ICC-licensed carrier must contain a clause stating that the authorized carrier maintain "exclusive possession, control, and use of the equipment for the duration of the lease" and "assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. § 1057.12(c)(1)(1995). Further, all authorized carriers must maintain insurance or other form of surety "conditioned to pay any final judgment recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance, or use of motor vehicles" under the carrier's license. 49 C.F.R. § 1043.1(a)(1995).

*Prestige Cas. Co. v. Michigan Mut. Ins. Co.*, 99 F.3d 1340, 1342–43 (6th Cir. 1996) (footnotes omitted).

The language of the MCS-90 Endorsement in the Green Line Policy and in the GTF Policy provides:

In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured elsewhere . . . . It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

(MCS-90 Endorsement; Doc. No. 31-6 at 11) (emphasis added).

14

Federal law governs the interpretation of the MCS-90 Endorsement in this case. *Armstrong v. United States Fire Ins. Co.*, 606 F. Supp. 2d 794, 820 (E.D. Tenn. 2009). The endorsement is required by federal law, and its language is prescribed by a federal regulation. It is a well settled principle that "the meaning of words in a federal statute is a question of federal law." *Id.* (quoting *Western Airlines, Inc. v. Board of Equalization of State of South Dakota*, 480 U.S. 123 (1987)). Thus, virtually all jurisdictions to consider the question have concluded that the interpretation of an MCS-90 endorsement is a matter of federal law. *See id.* (citing as examples, *inter alia*, *Ford Motor Co. v. Transport Indem. Co.*, 795 F.2d 538, 545 (6th Cir. 1986); *Planet Ins. Co. v. Transport Indem. Co.*, 823 F.2d 285, 288 (9th Cir. 1987); *Canal Ins. Co. v. First General Ins. Co.*, 889 F.2d 604, 610 (5th Cir. 1989), *modified on other grounds*, 901 F.2d 45 (5th Cir. 1990); and *In re Yale Express Sys., Inc.*, 362 F.2d 111, 114 (2d Cir. 1966)).

Carolina has undertaken the defense of the New York actions pursuant to the GTF Policy's MCS-90 Endorsement. Carolina assets that, "[w]hile [it] may have a duty under the federal motor carrier laws mandating MCS-90 coverage in order to ensure that the public is protected in the first instance, there is nothing preventing Carolina from recovering all of its expenditures from the proper insurer." (Carolina Mot. for Summ. J. at 8; Doc. No. 31.) Carolina maintains that the proper insurer is Canal because the Green Line Policy "should be deemed primary for this loss." *Id.* Carolina concludes that, "as between Carolina and Canal, the liability policy that schedules a covered vehicle must provide primary coverage over a policy which does not, by its terms, cover the vehicle or its driver at all." *Id.* at 11–12. This Court, however, disagrees with Carolina's position.

Initially, the Court notes that the MCS-90 Endorsement specifically indicates that it

15

applies "regardless of whether or not each motor vehicle is specifically described in the policy." (MCS-90 Endorsement, *supra*.) Carolina quoted the language of the MCS-90 Endorsement; however, Carolina omitted this language and replaced it with an ellipsis.

As to Carolina's argument that the Green Line Policy is primary, Canal asserts that because Farah was not a permissive user insured under the Green Line Policy at the time of the accident, the Green Line Policy cannot provide primary coverage for Farah's accident. (Canal Mot. for Summ. J. at 17.) Because the Court agrees with Canal that Farah was not a permissive user insured at the time of the accident, as discussed *supra*, it would appear that Canal therefore is not, as Carolina claims, the "proper" or "primary" insurer as it argued in its Motion. *See Campbell v. Bartlett*, 975 F.2d 1569 (10th Cir. 1992) (interpreting "insured" under the MCS-90 endorsement to be the same as the definition used in the underlying policy).

Yet in its Reply Brief, Carolina suggests that "[e]ven if the terms of Canal's policy limit or exclude coverage, Canal cannot avoid its ancillary duties to indemnify under the MCS-90." (Reply at 12; Doc. No. 37.) Carolina relies upon *Pierre v. Providence Washington Insurance Co.*, 99 N.Y.2d 22 (N.Y. App. 2002), for this proposition, *i.e.*, that Canal can be held liable under the Green Line Policy's MCS-90 Endorsement even if Farah was not a permissive user insured at the time of the accident. Carolina asserts that coverage under the Green Line Policy is triggered so long as "a judgment is entered implicating the coverage under the policy and/or the endorsement." (Reply at 12–13; Doc. No. 37.)

The Court, however, finds *Pierre* unhelpful here. In *Pierre*, the New York appellate court considered a situation where an injured party obtained a judgment against an insured tractor owner and driver who did not notify the trailer owner's insurer of the accident, as required by the

16

insurance policy. The insurance company "disclaimed coverage based solely on the alleged failure of the defendants named in the judgment to meet the notice of accident condition in the policy." *Pierre*, 99 N.Y.2d at 234. There was no dispute that the insurance policy covered the accident that resulted in the judgment. *See id.* ("[I]t is undisputed that Harris and Conquest meet the policy's definition of an insured. Providence disclaimed coverage based solely on the alleged failure of the defendants named in the judgment to meet the notice of accident condition in the policy."). The court held that the MCS-90 endorsement excused the failure to notify the insurer, and required the insurance company to satisfy the judgment.

Although Carolina does not provide any argument aside from what the Court quoted above, a close reading of *Pierre* uncovers some analysis that may lend support to Carolina's position. The *Pierre* court reviewed cases that decided whether an insurance company was responsible for a judgment when the party responsible for the accident was not the "named insured" under the policy. In that context, the court stated that where the party responsible for the accident "was insured under the policy coverage provisions *as specifically modified by the MCS-90 endorsement* (as in *John Deere* and *Adams*), the injured party was entitled to payment under the endorsement, regardless of whether the responsible party happened to have been the named insured who purchased the policy." *Id.* at 232 (emphasis added). Thus, from this language it appears that at least two courts, *John Deere Ins. Co. v. Nueva*, 229 F.3d 853 (9th Cir. 2000) and *Adams v. Royal Indem. Co.*, 99 F.3d 964 (10th Cir. 1996), have permitted an MCS-90 endorsement to *modify* an underlying policy's insurance coverage provisions.

The *Pierre* decision noted that the Ninth Circuit in *John Deere* "concluded that the [MCS-90] endorsement negated the policy limitation which restricted coverage to accidents

17

involving covered vehicles, thereby expanding the policy's definition of an insured . . . ." *Id.*

232. Similarly, the *Pierre* court assessed *Adams*, stating:

> The Court of Appeals for the Tenth Circuit held that the motor carrier's policy could
> be used to pay the judgment obtained against the driver of the truck, who was using
> the vehicle with the motor carrier's permission at the time of the accident, even
> though the truck was not listed as a covered vehicle in the policy. As in *John Deere*,
> the driver did not fall within the policy definition of an insured but the court
> determined that the MCS-90 endorsement modified and expanded the policy
> definition, thereby bringing the driver within the ambit of the policy and rendering
> the insurance company liable for payment of the judgment.

*Id.* at 232–33.

Following the reasoning of these two cases, this Court would be required to modify the

limiting phrase in the permissive user insured definition in the Green Line Policy to remove the

phrase "own[s], hire[s] or borrow[s]." (Green Line Policy § II(A)(1)(b).) Thus, the provision

would require only that a permissive insured be driving a covered auto. The Court, however,

finds this type of modification inappropriate because the facts of the case *sub judice* are

fundamentally distinguishable from *John Deere* and *Adams* in that this is not a case involving a

member of the public as a party, but instead is a case between two insurers.

In *Armstrong v. United States Fire Ins. Co.*, 606 F. Supp. 2d 794 (E.D. Tenn. 2009),[5] a

---

[5]The Court notes that interpretation of whether an MCS-90 endorsement requires
coverage has resulted in case law that "is far from clear and somewhat conflicting." *Armstrong*,
606 F. Supp.2d at 820. The *Armstrong* court opined that there appear to be two basic approaches
to the interpretation of the MCS-90. "One approach, with some variations in the case law, is to
interpret the MCS-90 endorsement as any other policy endorsement and determine its meaning in
the context of other policy provisions, applying the usual rules for interpretation of insurance
contracts. . . . The other approach is to interpret the MCS-90 only in the context of the regulatory
and statutory framework which mandates its existence." *Id.* In the present case, neither party
directs this Court's attention to this dichotomy nor asks this Court to consider it in making its
decision on the issues presented herein.

sister district court explained that courts view cases in which a member of the public seeks

coverage under an MCS-90 endorsement in a very different light than they view cases between

two or more insurers. Assessing *Adams*, the *Armstrong* court indicated that Adams was "a

member of the general public, which is precisely the group that is intended to be protected by the

[MCS-90] endorsement." *Id.* at 810 (citing *Adams*, 99 F.3d at 969). "Thus, the Tenth Circuit

made a distinction between cases where an injured member of the public seeks recovery because

of the endorsement and cases where there are disputes among insurers over ultimate liability."

*Id.*

Likewise, in *John Deere* the "Ninth Circuit framed the question as 'whether a federally

mandated endorsement to an insurance policy creates a duty on the part of an insurer to

indemnify a permissive user of an auto not covered by the underlying policy for injuries he

negligently caused to members of the public.'" *Id.* at 811 (quoting John Deere, at 854).

> Noting that the "purpose of the MCS-90 is to assure that injured members of the public are able to obtain judgment from negligent authorized interstate carriers," *Id.* at 857 (citing *Harco Nat. Ins. Co. v. Bobac Trucking, Inc.*, 107 F.3d 733 (9th Cir. 1997)), the court found that the appellants, injured members of the public, "are precisely the group meant to be protected by the MCS-90" and made a distinction between cases where injured members of the public seek indemnity under an MCS-90 and the case were two insureds or an insurer and its insured are seeking to determine their rights pursuant to the policy. *Id.* at 857.

*Id.*

This Court too finds it proper to differentiate between cases that involve a member of the

public and those between two or more insurance companies. "While stated in various ways,

there is almost universal agreement that the purpose of the MCS-90 is to protect the public." *Id.*

at 822–23 (citing *Empire Fire and Marine Insurance Company v. Guaranty National Insurance

Company*, 868 F.2d 357, 362-63 (10th Cir. 1989) ("[T]he ICC endorsement [the predecessor of

the MCS-90] . . . had its origin in the ICC's desire that the public be adequately protected when a licensed carrier uses a leased vehicle to transport goods pursuant to an ICC certificate."); *Adams*, 99 F.3d at 968 ("[T]he policy behind this ICC endorsement was to protect the public from uninsured regulated vehicles. . . . This ICC endorsement is designed to require ICC-certified carriers to insure against public liability for all their motor vehicles that are subject to the financial responsibility requirements of the Motor Carrier Act.  By requiring all such described insurance policies to contain this ICC endorsement, the ICC prevents the possibility of that, through inadvertence or otherwise, some vehicles may be left off a policy to the detriment of the public."); Canal Ins. Co. v. First General Ins. Co., 889 F.2d 604, 611 (5th Cir. 1989) (noting that the "policy embodied in the statutes and regulations was to assure that injured members of the public would be able to obtain judgments collectible against negligent authorized carriers."), *mandate recalled and reformed*, 901 F.2d 45 (5th Cir. 1990); *Travelers Ins. Co. v. Transport Ins. Co.*, 787 F.2d 1133, 1140 (7th Cir. 1986) (stating the purpose of the ICC regulations "is to insure that an ICC carrier has independent financial responsibility to pay for losses sustained by the general public arising out of its trucking operations"); *John Deere*, 229 F.3d at 857 ("It is well established that the primary purpose of the MCS-90 is to assure that injured members of the public are able to obtain judgment from negligent authorized interstate carriers."); *Kline v. Gulf Ins. Co.*, 466 F.3d 450, 456 (6th Cir. 2006) ("The federal government balanced the need to compensate victims with the needs of industry and determined the appropriate minimum compensation for members of the public.")).

Based on the foregoing, the Court finds that the Green Line Policy's MCS-90 Endorsement does not provide coverage for the accident which is the basis of the New York

personal injury lawsuits.

IV.

For the reasons set forth above, the Court **GRANTS** Defendant's Motion for Summary

Judgment (Doc. No. 30) and **DENIES** Plaintiff's Motion for Summary Judgment (Doc. No. 32).

The Clerk is **DIRECTED** to **ENTER JUDGMENT** in accordance with this Opinion and Order.

**IT IS SO ORDERED.**

4-18-2013

**DATE**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**